## W. H. HAMMAN v. WM. KEIGWIN.

1. The plea of innocent purchaser can only be made available to one who relies on it by showing, *first*, that he was a *bona fide* purchaser; *second*, that he purchased without notice, either actual or constructive ; and *third*, that he paid the purchase money; and this must be shown independent of any recitals in the deed.

2. While parol testimony cannot be admitted to vary the terms of a written contract, it may be considered in all cases to explain an ambiguous one.

3. Where the terms of a deed, considered with reference to title bonds for land, which were intended to be satisfied by its execution, are ambiguous and contradictory, a resort may be had to parol testimony, in con-

nection with the title bonds, and the considerations on which it was based, to ascertain the land intended to be embraced in it by the parties.

APPEAL from Robertson.     Tried below before the Hon. John B. Rector.

This was an action of trespass to try title, brought by Hamman, for a narrow strip of the Mary Peterson league, extending entirely across the league and containing 284 acres. Keigwin asserted title in himself under certain title bonds from John Peterson, son and sole heir of the grantee, Mary Peterson. He also, in a separate plea, claimed title through a deed from John Peterson to himself, alleging that the deed was intended to be made in pursuance of the requirements of the title bonds first relied on ; that by mistake a part of the land was omitted, and asked for a correction of the same, and for equitable relief.

The other material facts are fully stated in the opinion.

*Hancock & West*, for appellant.—If the parties had contracted with reference to the excess of land, and one had intended to buy it and the other to sell it, and through a mistake of either or both parties, or of the draughtsman of the deed, their intentions had not been expressed in the deed, a court of equity would, if relief were sought within a reasonable time, interpose. (1 Story's Eq., Secs. 134, 140, 141, 144, 146, 150, 151, 156, 157.)

But there is no error here, or mistake. Both the appellee and his vendor supposed the league to contain 4428 acres, and dealt with it accordingly. When the bond of July 8, 1850, for 794 acres was given, that was supposed to convey the balance remaining unsold of the 4428 acres. Upon this idea the consideration was agreed upon and the bond executed. Can this court say that Peterson would have sold 1144 acres for $200 ? Is there anything

to show that they left in doubt the question of excess?
There is nothing of the sort; they both agreed upon 4428
as the number of acres in the league; of this, the deed
itself leaves no doubt.    Great emphasis will doubtless be
laid on the use of the word "balance," in the bond for
794 acres of July 8, 1850.    But the parol evidence ex-
plains the matter fully, and shows that the word "bal-
ance" is used in the bond as synonymous with 794 acres;
and as if to silence every tongue, subsequently to the ex-
ecution of this bond, and just prior to and contempora-
neous with the execution and delivery by Peterson to the
appellee of the final evidence of title, they meet together
and reduce their understanding to writing; and although
the writing was unambiguous and needed no explanation,
yet they do explain it and show that it expressed exactly
the idea of the parties; *i. e.* that one bought and the
other sold under the belief that there were only 4428
acres in the league, and contracted for the balance on that
theory.    The very intention of the parties and their pur-
pose was expressed and carried out by the terms of the
deed, and under the authorities cited there is no occasion
for equity to interfere and no grounds for chancery juris-
diction.    "Deeds (says Hilliard on Real Property, 2
Vol., 336, 3d Ed.) shall be construed as near the intent of
the parties as possible.    The words are not the principal
things in a deed, but the intent and design of the par-
ties."

In fact in all contracts and written agreements, wills,
or deeds, the intention of the parties is the polar star to
guide courts in the construction of the instrument.    This
is the golden rule of law, the sovereign guide of courts,
to which all other rules are subservient, and before which
all other rules give way.

Can this court say that John Peterson intended to
convey to the appellee an excess of 350 acres, when the

appellee swears that at the time of the contract neither he nor Peterson knew of such excess? We defy the production of any case furnishing a precedent for the action of the court below in reforming this deed, and engrafting upon it a purpose that did not exist when it was made, and enlarging it to convey 350 acres more than it was intended to convey. The deed of December 17, 1850, speaks for itself; the title bonds are merged in it. (2 Hilliard on Real Prop., 369; Haggerly v. Fagan, 2 Penn., 533; Smith v. Evans, 6 Binney, 102; Houghtaling v. Sellers, 10 Johnson, 297; Dart on Vendors, 383, note 1; Id., 382; Fry on Spec. Perf., Am. Ed., 319, note 14.) "The court will not interfere where the instrument itself is such as the parties intended it to be. If the parties voluntarily choose to express themselves in the language of the deed they must be bound by it." (Story's Eq., Sec. 113; Willard's Eq., 69; see especially O'Connell v. Duke, 29 Texas, 299.)

No case can be found where a court entertained an application to alter a deed when it is proved (as in this case) that the deed was drawn as the parties intended to draw it, and by its terms all the land intended to be sold was conveyed. We also invite the attention of the court to the following section in Fry on Specific Performance, Section 505: "But in order thus to procure the rectification of a contract, the proof must be clear, irrefragable, and the strongest possible." (Also p. 312, note 11; Sec. 511, note 14; Secs. 524–529, inclusive.) In Section 501 Lord Thurlow is quoted to the following effect: "If both understood the whole was to be conveyed, it must be conveyed. But again, if neither understood so—if the buyer did not imagine he was buying, any more than the seller imagined he was selling this part, then this pretense to have the whole conveyed is as contrary to good faith upon his side as the refusal to sell would be in the

other case." The following pages in the recent work of Kerr on Fraud and Mistake are also referred to : 427–429, 435, 436 ; also U. S. v. Monroe, 5 Mason, 572 ; Fry on Spec. Perf., 319, note 14 ; Eborn v. Cannon, 32 Texas, 249 ; Harrison v. Talbot, 2 Dana, 268 ; O'Connell v. Duke, 29 Texas, 299 ; Perry v. Farenholt, 29 Texas. Story's Equity, Section 151, justly observes : "In the application of the rule it is material to distinguish between error in circumstances which do not influence the contract, and error in circumstances which induce the contract." Story's Equity, Sections 134, 141 : "The fact must be material to the act or contract—that is, it must be essential to its character and an efficient cause of its concoction." (Holcomb's Eq., 41, 23 ; Mitford's Plead., 128, note ; Lead. Cases in Eq., 2 Vol., 540 ; 3 Tucker, 403 ; 2 Phill. Ev., 669, note 493 ; Smith v. Johnston, 21 Texas.)

These authorities are cited because they are recent and contain a very fair review of the law of the case, and show beyond cavil or question, that it is beyond the province of a court of chancery to put words in the mouth of the dead, or to make deeds for parties which they never intended to make for themselves.

We therefore respectfully submit that the judgment of the court below should be reversed, and this court proceed to render the judgment which should have been rendered below, awarding the appellant a writ of possession for the land in suit.

*Gould & Street*, for appellee.—That the deed was intended to be in pursuance of the bonds, and to embrace all of the land in the bonds, being the entire balance of the league ; that the parties and Colonel Patrick, who made the calculation for them, assumed the accuracy of the field notes in the patent, and basing their calculations on that assumption, estimated the distances and number of

acres, and by reason of the excess of the survey and of its lines, were led by mistake to give such a description as failed to embrace all of the land intended, are facts which might well be inferred from the face of the patent, bonds and deeds, and which we shall assume to be clearly established by the evidence.

The law is well settled, that in cases of plain mistake, clearly made out by satisfactory proofs, relief will be granted. (1 Story's Eq., Sec. 157; Kerr on Mistake, p. 419; Raines v. Calloway, 27 Texas, 685.)

When the deed recites that it is made in pursuance of a bond, no other evidence is needed; but if the attendant circumstances or other evidence clearly establish such intention, it will suffice. (Id., Bold v. Hutcheson, 5 De G. M. & G., p. 558; Kerr on Mistake, p. 424.)

The plaintiff, however, claims that he is an innocent purchaser without notice, or at all events that he has equities which will forbid the correction of the mistake as to him. Unless he occupies the position of a *bona fide* purchaser for value without notice, he cannot be protected. (1 Story's Eq., Sec. 165; Wall v. Arrington, 13 Ga., 89; Strong v. Beach, 11 Ohio St. R., 283.)

The plaintiff is not an innocent purchaser, because—

1. His deeds are quit-claims. (Rogers v. Burchard's Heirs, 34 Texas, 453; Villa v. Rodriques, 12 Wallace, 338.)

2. He purchased from heirs. (Id.)

3. Defendant was in actual possession before any payment. (Watkins v. Edwards, 23 Texas, 447.)

4. He had actual notice of defendant's claim, and of the laying off of the town of Bremond under defendant.

The plaintiff sets up the lapse of time as an objection to the correction of the mistake. To this we reply—

1. That the defendant being in possession, no lapse of time will make his equities less efficacious, as a ground of

defense. This doctrine is clearly set forth in the case of Cox v. Bray, 28 Texas, p. 260. (See also Martin v. Parker, 26 Texas, p. 259.) It is substantially embodied in the often asserted sufficiency of a bond for title to protect the purchaser who has paid the purchase money.

2. The defendant is not chargeable with laches until the mistake was discovered, or ought to have been discovered; or until the sale by the heirs, or some hostile act by them or their ancestor. (Yeary v. Cummins, 28 Texas, p. 96; Mitchell v. Shepherd, 13 Texas, p. 493.)

3. It has been repeatedly recognized by our courts that, in favor of a party in possession, more than ten years must have elapsed to justify the refusal of equitable relief. (Vardeman v. Lawson, 17 Texas, 10; Mitchell v. Shepherd, 13 Texas, 493.)

The courts have always been liberal in correcting mistakes after great lapse of time. On this point, and on others in the case, we beg to refer the court to the following cases: Wall v. Arrington, 13 Ga., 88; Strong v. Beach, 11 Ohio St. R., 283; Stone v. Hale, 17 Ala., 564; DeRumer v. Contellos, 4 John. Ch., 85; Gillespie v. Moon, 2 John. Ch., 601; East v. Thorn, 3 P. Wm., 126; Wash v. Merrill, 1 Day, 139.

McADOO, J.—This was an action of trespass to try title, in the District Court of Robertson county, instituted by the appellant against the appellee, to recover a narrow strip of land running entirely across the Mary Peterson league, the land in controversy containing about two hundred and eighty-four acres.

The appellant set up his claim to the land in controversy under a quit-claim deed from the heirs of John Peterson, deceased (who was the son and sole heir of Mary Peterson, the original grantee), to the Mary Peterson league.

The appellee plead not guilty, and also plead specially, setting up certain title bonds from John Peterson to him, and also a deed of warranty from John Peterson to him, which he alleged was in pursuance of the title bonds above mentioned ; but he also plead that there was a mistake in the deed, by which a portion of the land included in the title bonds was omitted in the deed ; and he prayed for a correction of the mistake and for equitable relief.

The deed from Peterson to appellee was duly recorded in 1852. The title bonds were not recorded in the county until after the purchase by appellant. The appellant acquired the quit-claim deed in 1869. Suit was filed on January 26, 1872.

The appellee was in possession, and had made large and valuable improvements on the land in controversy, before the acquisition by appellant of the quit-claim deed. The deed of Peterson to appellee, Keigwin, in its terms, does not include the land in controversy ; and, the title bonds not being recorded, in the absence of actual notice of the alleged mistake by the appellant Hamman, if the conveyance to him were by deed of warranty instead of a quit-claim deed, and were not from John Peterson's heirs, this case would admit of a ready and easy solution; being, in such a case, a *bona fide* purchase for a valuable consideration, without notice, no equities between John Peterson and Keigwin could possibly be made to affect him.

But Hamman, the appellant, relies on a quit-claim deed, and that deed comes from the heirs of Keigwin's vendor, and Keigwin was in actual possession before the purchase and payment by Hamman. Is Hamman, therefore, an innocent purchaser without notice ? Does his purchase, under the circumstances, raise such equities in his behalf as will forbid the correction of any mistake in the deed to Keigwin, if such mistake exist ?

In the case of Rogers v. Burchard, 34 Texas, 441, this court decided, on the authority of Morse v. Godfrey, 3 Story's C. C. R., 365, and Van Rensalaer v. Kearney, 11 Howard, 322, that "a quit-claim or deed of release 'of all his right, title, and interest' purports to convey, and does convey, no more than the present interest of the grantor;" and on the authority of Oliver v. Piatt, 3 Howard's U. S., 410 ; Smith's Heirs v. The Bank of Mobile, 21 Ala., 124; and Tarras v. Patten, 20 Mo., 81, that "one holding a quit-claim deed cannot be regarded as a *bona fide* purchaser without notice."

In that case the doctrine laid down in Watkins v. Edwards, 23 Texas, 447, that "a party who desires the benefits accorded to innocent purchasers must show, first, that he was a *bona fide* purchaser ; second, that he purchased without notice, actual or constructive ; third, that he paid the purchase money, and this he must show independent of any recital in the deed," was approved by this court.

We have in this case reviewed the authorities above referred to, and see no reasons to doubt the correctness of the rulings of this court in the case of Rogers v. Burchard.

It appearing that in this case Hamman purchased by quit-claim, and from the heirs of John Peterson, it follows, from the foregoing reasoning and authorities, that he can set up no equities, nor resist any which could not be set up and resisted by the heirs themselves, and the heirs themselves can set up none, and resist none, which could not be set up and resisted by John Peterson himself, if living.

It therefore becomes necessary that we examine the record and determine whether the equities set up by the appellee, Keigwin, in the alleged mistake in the deed, exist; and if so, to determine the remedy.

The Peterson league was sold by John Peterson under-

different conveyances to different persons, and it may be necessary to examine the various conveyances and contracts of sale in order to determine the question involved in this case.

The first of the sales of the league was in 1844, whereby John Peterson conveyed to A. G. Gholson 1514 acres, by metes and bounds as follows: "Beginning at the southwest corner of the league, running with the south boundary line of said survey so far as to include 1514 acres by running at right angles from the south boundary line, so as to intersect the north boundary line of said survey." This left the balance of the league in a rectangular shape. There was no actual survey, and no lines or corners marked, when this tract of 1514 acres was sold to Gholson.

On the fourth of February, 1850, Keigwin purchased by title bond from John Peterson, 1800 acres of the league, thus described: "To begin at the northeast corner of said league survey, running with the north boundary line, to a line of 1514 acres sold to A. G. Gholson, and with Gholson's line, with the east boundary line, so as to include the quantity."

On the fifteenth of March, 1850, Peterson sold to S. Compton Smith 320 acres of the league, "to be sold off of either corner of the unsold portion of the said league, as the said Smith may prefer."

On July 8, 1850, Peterson, also by title bond, sold to Keigwin, for $2000, "seven hundred and ninety-four acres of land, the balance of his mother's (Mary Peterson's) headright league, beginning on the east line of said survey, at the southeast corner of a tract of 1800 acres sold to said Keigwin off of said survey on the fourth day of February, 1850 (for which said Keigwin holds his bond for a deed, executed on that day), and running with the south boundary of said tract of 1800 acres to the east

boundary line of a tract of 1514 acres sold to A. G. Ghol-
son; thence with Gholson's line and with the east boundary
line, so far as to include the quantity, including or being
the whole balance of said survey except 320 acres sold to
S. C. Smith out of the southeast or southwest corner of
the unsold part."

Peterson executed a deed to Keigwin, December 19,
1850, to the following described land: "A part of the
headright league of land granted to Mary Peterson,"
"beginning at a stake on the northeast corner of said
league survey, from which a post oak bears S. 49° W. 8
varas; thence S. 30° E. 4672 varas to a stake for south-
east corner of the survey, from which a post oak bears,
marked S. S. 12° W. 3 varas; thence S. 60° W. 3527
varas to a stake in the south boundary line of said sur-
vey; thence N. 30° W. 4672 varas to a stake in the north
boundary line of said survey; thence N. 60° E. 3527
varas to place of beginning, containing an area of 2914
acres of land."    The consideration of this deed was
$975.

The testimony shows that at the time this deed was
made Keigwin had also purchased the 320 acres sold to
Smith, and the purchase money of the two tracts con-
veyed by title bond to Keigwin was paid.    It further
shows that the deed was intended to supersede the sev-
eral title bonds to Keigwin and Smith, and to cover the
land embraced in them all.

The question to be determined is, taking the whole
transaction together, considering the various title bonds
and the considerations upon which they were executed,
and the deed and all the facts connected with the trans-
action, what were the intention and the understanding of
John Peterson and Keigwin? Did Peterson intend to
convey in the deed to Keigwin, as the culmination of the
dealings in regard to the land, all of the Mary Peterson

league except the 1514-acre tract sold to Gholson? And did Keigwin understand and believe that he was purchasing and that the deed conveyed it all? If so, then this court must enforce, in its decree, the rights of these parties accordingly.

It is insisted by the counsel for the appellant, that the parol testimony of Patrick and others was erroneously admitted on the trial in the court below. We think not. Parol testimony can, in no case, be admitted to vary the terms of a written contract; but it may be received in all cases to explain an ambiguous one. Though the deed, by itself, and without reference to the attendant facts and circumstances, could not be explained by parol proof to include the land in controversy, yet, when viewed in connection with the title bonds which preceded it, and the transactions which led to its execution, and the considerations on which it was based, it is apparent that resort was properly made to parol evidence, explanatory of the ambiguities in the several title bonds and the deed. The terms of the two title bonds to Keigwin called for a line, but called for a shorter distance than would reach it; the last one called for a certain amount of land, which was less than the true amount, and yet designated it as *all* the land previously unsold.

What did he mean—all or only the number of acres mentioned? The terms are ambiguous and contradictory.

It was proper to determine, by parol evidence, the intent of the parties. It was done to the satisfaction of the jury. They decided in favor of the appellee. There was ample evidence to sustain their finding, and we can scarcely see how they could have found otherwise.

The judgment of the court below must therefore be affirmed.

AFFIRMED.